**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TERESA ANNE SCOTT,** | : | **CIVIL ACTION NO. 1:02-CV-1586** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **PAMELA WELLINGTON LACKEY** | : | |
| **and EVAN LESLIE ADAMS,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Teresa Scott ("Scott") brings the above-captioned matter under the court's diversity jurisdiction, alleging that defendants Pamela Wellington Lackey ("Wellington") and Evan Adams ("Adams") sullied her reputation by means of electronic mail messages and public postings on internet discussion fora. Adams has moved for summary judgment on all claims and challenges the court's exercise of personal jurisdiction. (See Doc. 302.) The magistrate judge reviewed the parties' summary judgment briefing and filed a report recommending that the court deny Adams' summary judgment request and proceed to trial on the merits. (See Doc. 336.) Adams, in turn, objects to the magistrate judge's conclusions regarding personal jurisdiction. (See Doc. 337.) Following an independent review of the record, the court finds the exercise of personal jurisdiction to be inappropriate; thus, for the reasons that follow, the report of the magistrate judge will be rejected and Adams' motion for summary judgment will be granted.

## I.    **Statement of Facts**[1]

The facts underlying this dispute are well known to the parties and are set forth in the report of the magistrate judge.  (<u>See</u> Doc. 336 at 11-13.)  The court will therefore review and supplement the facts only to the extent necessary to reach a disposition on the motion for summary judgment.

Adams is a Canadian citizen and resides in British Columbia.[2]  (<u>Id.</u> at 11.)  He is also an actor who has acquired a geographically diverse fan base throughout the course of his twenty-five-year acting career.  Scott and Wellington were two of Adams' most devoted fans.  Scott is a Maryland resident.  (<u>Id.</u> at 11.)  Wellington is currently employed in Pennsylvania and appears to be a resident of the state, as well.  (<u>See</u> Doc. 160 ¶ 2; Doc. 161 ¶ 2.)

In the late 1990s, Adams' admirers began to network with one another through internet discussion fora and email messaging.  One forum that emerged around this time was called the "Evan Adams discussion group."[3]  (<u>See</u> Doc. 336 at

---

[1] In accordance with the Federal Magistrates Act, the court's review over the factual findings of the magistrate judge is *de novo*.  <u>See</u> 28 U.S.C. § 636(b); <u>see also</u> <u>infra</u> Part II.  Furthermore, because Adams has filed a motion pursuant to Federal Rule of Civil Procedure 56, the court will present the facts in the light most favorable to Scott, who is the nonmoving party.  <u>See</u> <u>infra</u> Part II.

[2] Adams has never lived in Pennsylvania, and has only visited the state on two occasions.  (Doc. 304 ¶ 3; Doc. 317 ¶ 3.)

[3] The parties agree that the Evan Adams discussion group was created by an individual named "Jenni," about whom virtually nothing is known except that her email address was "Inmajeans@aol.com."  (Doc. 304 ¶ 8; Doc. 317 ¶ 8; Doc. 336 at 12.)

12; see also Doc. 304 ¶ 8; Doc. 317 ¶ 8.)  The group billed itself as an online

community in which "discussion centers around Evan's career, his interests, his

latest projects, and any topic related to Indian Country issues."  (Doc. 325, Ex. B.)

The group was also public in nature; according to its online description, the forum

"welcome[d] all people from all walks of life to join us for good discussion, new

friends, and fun."  (Id.)  Approximately twenty-five individuals were members of the

discussion group as of May 2001.  (See Doc. 325, Ex. A.)

Wellington was a group member for six months before she became co-

moderator of the forum in early 2000 along with another fan, Liz Kelso ("Kelso").

(Doc. 304 ¶ 9; Doc. 304, Att. 3 at 19; Doc. 336 at 12.)  As moderator, Wellington could

pre-screen member messages before they were distributed group-wide or remove

messages that she considered inappropriate.  (Doc. 304, Att. 3 at 26.)  Scott joined

the Evan Adams discussion group in 2000, allegedly at Wellington's request.  (See

Doc. 325 ¶ 6.)  Instead of using her legal name to communicate with fellow group

members, however, Scott signed up with the group using the pseudonym "Talking

Dreams."  (Doc. 336 at 4.)  The name "Talking Dreams" was Scott's internet

moniker, a nickname—or 'handle'—that she almost always used to correspond with

others in the online community.  (See id.)

The evidence indicates that Adams and Wellington developed a friendship

more intimate than the bond typically shared between celebrity and adoring fan.  In

fact, Wellington testified that she began regular email correspondence with Adams

in 1999, before she ever joined the Evan Adams discussion group or became one of

its moderators.  (Doc. 304, Att. 3 at 13.)  This personal correspondence continued after Wellington became co-moderator of the Evan Adams group.  At times, her private conversation with Adams yielded information that pertained to Adams' career and which was not known to the public at large.  Adams normally did not permit Wellington to share such information with the other members of the discussion group.  (See Doc. 304, Att. 3 at 12.)  According to Wellington:

> I would ask [Adams] if I could share information, and he would either say yes or no.  It was about things related to Sherman Alexie[4] and movies coming out, things like that.  Occasionally he would say, yeah, go ahead, and most of the time he would say, no, Sherman doesn't want that released yet.

(Id. at 14.)  The parties agree that when Adams permitted Wellington to disclose details that were otherwise non-public, such disclosures typically consisted of "very general information about movies . . . related to Sherman Alexie."  (Id.; Doc. 304 ¶ 16; Doc. 317 ¶ 16; Doc. 336 at 13.)  Moreover, Adams stated that he "would not

---

[4] Sherman Alexie was a writer and director who frequently worked with Adams in the late 1990s and in the early part of this decade.

expect [Wellington] to share anything with the public" without his approval.[5]  (Doc. 304, Att. 5 at 69; Doc. 323 at 70.)

For his part, Adams testified that he was not involved with, and possessed little knowledge of, the goings-on within the discussion group.  (See Doc. 323 at 70-72; Doc. 304, Att. 5 at 73.)  When he learned of the group's existence, Adams describes his reaction as one of indifference.  (Doc. 304, Att. 5 at 73.)  Wellington's testimony largely supports Adams' characterization; she states that she typically did not send him messages distributed by group members, nor did she advise him of

---

[5] Notwithstanding Adams' expectation, the record contains evidence that Wellington at times relayed the contents of her private conversations with Adams without his approval.  For example, on April 21, 2000, Wellington transmitted an email message to Scott that read as follows:

> Dear Terri,
> I just got a beautiful long e from Evan, and it seems that he and ShadowCatcher received your little note about asking to see Evan nude in Res blues.  He said they are getting a lot of 'mileage' out of it, and his new nickname is 'Full Frontal Adams' . . . lol!  PLEASE, don't quote me!  You can't breathe a word, because it was the content of a private e from him tonight, ok?  I never breach his trust, but I had to let you know it hit its mark!  Ok?  lips sealed?  I hope that brought cheer to an otherwise weird day.

(Doc. 326, Ex. L.)  Adams' purported statements are hearsay and will not be accepted for their truth.  Shelton v. Univ. of Med. & Dentistry, 223 F.3d 220, 223 n.2 (3d Cir. 2000); Judkins v. HT Window Fashions Corp., 624 F. Supp. 2d 427, 434 (W.D. Pa. 2009).  Nonetheless, Wellington's message is relevant insofar as it demonstrates her penchant to relay Adams' private statements, against his express wishes, to other members of the Evan Adams discussion group.  There is no record evidence that Wellington ever relayed the contents of a private conversation to the discussion group as a whole, however, and her unauthorized prattle is limited to private email exchanges between Wellington and other discussion group members.  (See, e.g., Doc. 215, Exs. 1, 3, 5-7, 18-19, 25, 38, 39, 41.)

the contents of such messages.  (See Doc. 304, Att. 3 at 28.)  However, Wellington

claims that she would occasionally forward a group member's question, and that

Adams would occasionally transmit his reply to the group in its entirety.[6]  (Id.)

---

[6] The record contains only one actual instance in which Wellington sent a group-wide email forwarding Adams' answers to fan queries.  On May 24, 2000, Wellington distributed what she purported to be an unedited email sent from Adams.  (See Doc. 327, Ex. F.)  That email reads as follows:

Girl,
I wanted to answer these questions because they're a nice break from this week's study routine.
1.   My fav foods:  chicken fingers, oranges, noodles dishes, dill pickles, lobster, gin, anything with garlic.
2.   Music:  musically illiterate . . . but go crazy for chick torchslingers!
3.   My fav Indian actors:  Tantoo Cardinal, Margo Kane & Michelle St. John—those women can do ANYTHING!  Ben Bratt is pretty darn good too—can't wait to see him in a challenging role!
4.   Grow my hair back?  Probably.  I'm getting to the point where I hate my short hair.  Nobody thinks I'm Indian anymore.  But I won't grow it back for a year at least . . . In the meantime, I have a really great wig. . .
5.   I'm a pretty good cook.  I make excellent 'date food.'  5 dates is my limit though—then I run out of impressive dishes to make.  After that, it's 'let's eat out!'  Oh, that sounds kind of raunchy.
6.   My fave places to visit?  In no particular order:  my rez (Sliammon), New York, San Diego/San Jose/San Fran.
7.   Extra tidbit:  I'm talking to a director about doing a movie this fall in which I would play a steamy professional caught between 2 lovers.  I hear it's very sophisticated, and, well, sexy.
Soon!
Evan

(Id.)  Again, Adams' purported statements will not be admitted for their truth, see Shelton, 223 F.3d at 223 n.2, but are relevant to establish the nature of the statements Wellington supposedly made on Adams' behalf.

The record also contains one instance in which Adams himself corresponded with the discussion group by means of posting a message to its members. (See Doc. 327, Ex. H.) This communiqué, which was transmitted on December 1, 2000, evidences Adams' lack of familiarity with the group or the subject matter of their conversations. After thanking the members for their recent birthday wishes,[7] Adams' correspondence states, in pertinent part, as follows:

> WHAT DO Y'ALL TALK ABOUT on this list???
> My classmates—who never watch television or movies and have no idea of my other career—are quite intrigued by the notion of a discussion group. I would hope you get to discuss some of the exciting stuff I get to do, like study medicine![8] The TV stuff of late is wonderful—"Buffalo Tracks" has been a steep learning curve, "These Arms of Mine" was hysterically funny (playing a VERY pesky florist, of all things) to shoot, and "DaVinci's Inquest" was dark and challenging. . . .
> Anyway, this started off as a 'thank you' for my bd package, and also an acknowledgment of your kindness here in the discussion group and beyond. I will drop you all a line now and again, and I will let Liz [Kelso] know about developments as they come up.[]

(Id.) Adams claims that he has no recollection of sending this message, or of interacting with the group on any subsequent occasion. (See Doc. 323 at 71.)

_____

[7] Adams received an audiotaped birthday message from several group members in November 2000. (See Doc. 304, Att. 1 ¶ 10.) The audiotape contained a total of eleven different voice messages, three of which were left by "Talking Dreams." (See Doc. 304, Att. 1, Ex. A; see also Doc. 304 ¶ 23; Doc. 317 ¶ 23.) Talking Dreams' messages are replete with bizarre sexual innuendo, and it was this birthday recording that, in part, precipitated Wellington's allegedly defamatory statements. (See Doc. 303 at 6-8; Doc. 304 ¶ 23; Doc. 304, Att. 1, Ex. A; Docl 317 ¶ 23.)

[8] Adams entered medical school and began to pursue a career as a physician in 1998. (Doc. 336 at 12.)

At some point, Kelso altered the public description of the Evan Adams forum so that it read, "This is the official Evan Adams discussion group. . . . This is an official fan site discussion list sanctioned by Evan Adams." (See Doc. 325, Ex. B; Doc. 304, Att. 3 at 22-23.) Adams testified that he never authorized such an endorsement, (Doc. 304, Att. 1 ¶ 7), and the summary judgment record contains no testimony from Kelso to illuminate the issue. What is more, Wellington's testimony on this point is unhelpful, as she is without any personal knowledge pertaining to the matter.[9] (See Doc. 304, Att. 3 at 22-23.) Thus, Adams' assertion stands unrebutted.

Scott contends that Wellington was Adams' agent, and that when she interacted with the discussion group, she did so on Adams' behalf. To bolster this

---

[9] Wellington's lack of personal knowledge is illustrated by the following exchange during her deposition:

> Q:    Exactly how did he [Adams] authorize—how did he sanction it? You had a—what kind of discussion took place?
> A:    This was between he and Liz [Kelso].
> Q:    He and Liz?
> A:    Yes, because Liz was his official webmistress of his website. It wasn't between he and I. It was just a—I think it's cool.
> Q:    It says it is sanctioned by him, so—
> A:    He approved of it. He liked it there.
> Q:    He approved of it. You're saying you didn't have any discussion with him about that?
> A:    About it being—It was mostly between he and Liz. I don't recall. I don't recall. . . .
> Q:    How did you find out that it was okay to put this on there, to change this introduction to say that he sanctioned it?
> A:    He had no involvement in the list at all. He didn't read this.

(Doc. 304, Att. 3 at 22-23.)

claim, Scott proffers the affidavits of two group members, Ann Elisabeth Nordbo ("Nordbo") and Lonnie Cruse ("Cruse"), both of whom provide testimony consistent with Scott's position. Specifically, Nordbo states that she "believed Evan Adams endorsed the . . . discussion group operated by Pamela Wellington." (Doc. 320 ¶ 9.) Nordbo does not pinpoint the basis for her belief, but notes that "Pamela Wellington took control of the group and the introduction page to the group was changed to say that it was an '. . . official fan site discussion list sanctioned by Evan Adams.'"[10] (Id. ¶ 8.) Similarly, Cruse states that it was her "understanding that the group was sanctioned by Evan Adams." (Doc. 318 ¶ 6.) Cruse goes on to explain that "Evan Adams sent messages to the discussion group through either Ms. Wellington or Ms. Kelso. I therefore believed both women were Evan Adams's Internet representatives." (Id. ¶ 7.) In spite of this testimony, there is no evidence that Adams and Wellington entered any sort of formal or informal representation agreement, that Adams compensated Wellington for moderating the discussion forum, or that Adams ever expressed any desire for Wellington to serve as his "internet representative." (See Doc. 304 ¶ 17; Doc. 304, Att. 1 ¶ 8; Doc. 317 ¶ 17.)

Scott ultimately filed the instant suit, alleging that Wellington defamed her in several email messages privately sent to various members of the Evan Adams discussion group. Scott further alleges that Adams is vicariously liable for Wellington's purported torts because Wellington was acting as Adams' agent when

---

[10] As noted above, the record evidence shows that it was Kelso, not Wellington, who altered the discussion group description.

her comments were transmitted.[11]  On May 14, 2008, Adams moved for summary judgment, arguing that the court's exercise of personal jurisdiction was improper. (See Doc. 302.)  The magistrate judge disagreed, and concluded that the assertion of jurisdiction was appropriate because Wellington was a resident of Pennsylvania, Adams and Wellington had consummated an agency relationship, and Wellington's comments could therefore be imputed to Adams.  (See Doc. 336 at 18-19.) Consequently, the magistrate judge recommended that Adams' jurisdictional challenge be rejected and the case proceed to a trial on the merits.  (Id. at 29.)  On March 27, 2009, Adams filed objections to the magistrate judge's report, arguing that the report's personal jurisdiction analysis was both factually and legally flawed. (See Doc. 337.)  The parties have fully briefed Adams' objections and this matter is now ripe for disposition.

**II.**     **Standard of Review**

Under the Federal Magistrates Act, a district court may designate a magistrate judge to consider a motion for summary judgment and to submit a recommendation regarding the disposition of the motion.  See 28 U.S.C. § 636(b)(1). The district court reviews *de novo* those portions of the magistrate judge's report to which the parties object, and may accept, reject, or modify the recommendation in whole or in part.  See id.

---

[11] For a detailed discussion of the defamation claim, see Doc. 336 at 19-28.

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(c). The burden of proof is upon the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmovant on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

**III.**  **Discussion**

Adams' objections are focused upon the court's exercise of personal jurisdiction. Specifically, he claims that the evidence present in the summary judgment record does not permit the court to assert personal jurisdiction under the Calder effects test. Furthermore, he contends that the magistrate judge erred by grounding the jurisdictional analysis upon the existence of an agency relationship between Adams and Wellington. The court will first address the question of agency before turning to the exercise of personal jurisdiction.

## A.    <u>Existence of an Agency Relationship</u>

In the report, the magistrate judge does not rely upon the summary judgment record in order to reach his recommendation with respect to agency.  Rather, the report states, "Although defendant Adams disputes that defendant Wellington was his agent, the court has already determined that there is evidence upon which a reasonable jury could find that defendant Wellington was defendant Adams' agent." (Doc. 336 at 18 (citing Doc. 224 at 2 n.2)).  The magistrate judge further explains that conceptualizing Wellington as Adams' agent "means that, in effect, defendant Adams was present (through his agent) in this forum."  (<u>Id.</u> at 19.)  Thus, according to the report, Wellington's allegedly defamatory commentary is attributable to Adams.  (<u>See id.</u> at 18-19.)  Because these statements were transmitted via email correspondence originating in Pennsylvania, the magistrate judge concluded that jurisdiction was proper.  (<u>See id.</u>)

Adams assails this disposition, contending that "[t]he magistrate judge based his recommendation to deny *summary judgment* to Dr. Adams . . . entirely upon the Court's prior ruling on Dr. Adams's *motion to dismiss* under Rule 12(b)(2), and thereby erred."  (<u>Id.</u> (emphasis in original)).  Adams is indeed correct.  The report proceeds as if a definitive agency determination has been rendered as a matter of fact, (<u>see</u> Doc. 336 at 18), but derives this 'determination' from a memorandum denying Adams' Rule 12 motion to dismiss without prejudice.  (<u>See</u> Doc. 224.)  In the Rule 12 posture, however, the court explained that it was bound "to accept as true the allegations of the pleadings and all reasonable inferences therefrom."  (<u>Id.</u>

at 3.) Moreover, the court was careful to note that Wellington "*purportedly* acted as an authorized representative, agent, and employee of Adams," (id. at 2 (emphasis added)), and further qualified its memorandum by indicating that the statements of fact contained therein "reflect[ed] neither the findings of the trier of fact nor the opinion of the court as to the reasonableness of the parties' allegations," (id. at 1 n.1). Consequently, it was error for the magistrate judge to overlook the evidence proffered in the summary judgment record and to conclude that an agency relationship existed based solely upon the court's Rule 12 disposition. See Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330-31 (3d Cir. 2009) (explaining that when a court accepts a complainant's facts as true at the Rule 12 stage, it is "not precluded from revisiting the issue if it appears that the facts alleged to support jurisdiction are in dispute"); Marten v. Godwin, 499 F.3d 290, 295 n.2 (3d Cir. 2007) (stating that when a defendant asserts in a Rule 56 motion that undisputed facts show the absence of jurisdiction, the court must examine the record under the summary judgment standard).

The court has independently reviewed the evidence submitted by the parties in support of their Rule 56 briefing and holds that there is no genuine issue of fact in dispute with respect to the existence of an agency relationship between Adams and Wellington. Rather, the evidence clearly demonstrates that the two defendants

were, at most, merely friends.  Under Pennsylvania law,[12] an agency association

typically provides the agent with either actual or apparent authority to act on behalf

of the principal.[13]  See Volunteer Fire Co. v. Hilltop Oil Co., 602 A.2d 1348, 1351-52

(Pa. Super. Ct. 1992); Boulus v. United Penn Bank, 525 A.2d 1215, 1221 (Pa. Super.

Ct. 1987).  In either scenario, the party asserting agency must prove its existence by

---

[12] Jurisdiction over the instant action is based on diversity of citizenship, see 28 U.S.C. § 1332, which in this case requires the court to apply Pennsylvania law to the parties' substantive claims.  See Norfolk S. Ry. Co. v. Basell USA, Inc., 512 F.3d 86, 91-92 (3d Cir. 2008).  Neither party disputes the application of Pennsylvania state law to this matter.  Accordingly, decisions of the Pennsylvania Supreme Court are binding precedent upon this court, while Pennsylvania Superior Court decisions will be treated as persuasive precedent.  See State Farm Fire & Cas. Co. v. Estate of Mehlman, --- F.3d ---, 2009 WL 4827027, at *1 n.2 (3d Cir. Dec. 16, 2009).

[13] Pennsylvania law also recognizes theories of implied authority and agency by estoppel.  See Boulus v. United Penn Bank, 525 A.2d 1215, 1221 (Pa. Super. Ct. 1987); Friedman v. Kasser, 481 A.2d 886, 890 (Pa. Super. Ct. 1984).  Implied authority allows an agent to bind a principal to those acts which are necessary in the normal exercise of the agent's express authority.  Boulus, 525 A.2d at 1221.  A finding of express authority is, therefore, a prerequisite to the existence of implied authority.  See Friedman, 481 A.2d at 483.  Additionally, an agent may bind his or her principal by estoppel.  However, agency by estoppel may only arise from the conduct of the purported principal, and then only "[i]f the purported principal becomes aware that others are dealing with the purported agent in the mistaken belief that he is the agent of the purported principal and does not take reasonable steps to correct the mistake."  Diversified Packing & Dev. Corp. v. Dore & Assocs. Contracting, Inc., 48 F. App'x 392, 398 (3d Cir. 2002) (citing RESTATEMENT (SECOND) OF AGENCY § 8B); see also Apex Fin. Corp. v. Decker, 369 A.2d 483, 486 (Pa. Super. Ct. 1976) (holding that "[a]uthority by estoppel occurs when a principal, by his culpable negligence, permits an agent to exercise powers not granted to him, even though the principal did not know or have notice of the agent's conduct").  In the instant matter, there is no record evidence that Adams actually became aware that others were dealing with Wellington in the mistaken belief that she was his agent, or that he negligently allowed such a situation to endure.  Scott also does not argue that Adams is estopped from disavowing Wellington's allegedly defamatory statements; therefore, the court will not further entertain this theory of agency.

a preponderance of the evidence. <u>Scott v. Purcell</u>, 415 A.2d 56, 60 n.8 (Pa. 1980); <u>Volunteer Fire Co.</u>, 602 A.2d at 1351. A plaintiff need not proffer direct evidence of an agent's authority if it can be reasonably inferred from the circumstances of the case. <u>B & L Asphalt Indus. v. Fusco</u>, 753 A.2d 264, 269 (Pa. Super. Ct. 2000); <u>Volunteer Fire Co.</u>, 602 A.2d at 1351; <u>Morilus v. Countrywide Home Loans</u>, 651 F. Supp. 2d 292, 299 (E.D. Pa. 2008). Resolution of the agency question is typically reserved for the trier of fact, <u>B & L Asphalt</u>, 753 A.2d at 269, but may be resolved at summary judgment when the relevant facts are not in dispute, <u>Morilus</u>, 651 F. Supp. 2d at 299.

Actual agency exists "with the (1) manifestation by the principal that the agent shall act for him; (2) the acceptance of the undertaking by the agent; and (3) the control of the endeavor in the hands of the principal." <u>Tribune Review Publ'g Co. v. Westmoreland County Hous. Auth.</u>, 833 A.2d 112, 119-20 (Pa. 2003). A principal manifests intent through written or spoken words or similar conduct. RESTATEMENT (SECOND) OF AGENCY § 1.03. Among the requirements listed above, "the element of control is the touchstone of a principal-agent relationship." <u>Colantonio v. Hilton Int'l Co.</u>, No. Civ. A. 03-1833, 2004 WL 1274387, at *6 (E.D. Pa. June 8, 2004) (quoting <u>Myelle v. Am. Cyanamid Co.</u>, No. 92-5243, 1993 WL 93422, at *5 (E.D. Pa. Apr. 1, 1993)); <u>Morilus</u>, 651 F. Supp. 2d at 300; <u>Mahon v. City of Bethlehem</u>, 898 F. Supp. 310, 312 (E.D. Pa. 1995); <u>Kelly v. U.S. Steel Corp.</u>, 170 F. Supp. 649, 650 (W.D. Pa. 1959).

In the absence of an actual agency relationship, two individuals may form an affiliation based upon apparent agency. "Apparent authority is power to bind a principal which the principal has not actually granted but which he leads persons with whom his agent deals to believe that he has granted." Revere Press, Inc. v. Blumberg, 246 A.2d 407, 410 (Pa. 1968); see also Bennett v. Juzelenos, 791 A.2d 403, 409 (Pa. Super. Ct. 2003); Stallo v. Ins. Placement Facility of Pa., 518 A.2d 827, 830 (Pa. Super. Ct. 1986). Apparent agency "empowers the agent to bind the principal even when such authority has not actually been granted." Morilus, 651 F. Supp. 2d at 301; Hawthorne v. Am. Mortgage, Inc., 489 F. Supp. 2d 480, 486 (E.D. Pa. 2007). In addition, apparent authority "flows from the conduct of the principal and not that of the agent," D & G Equip. Co. v. First Nat'l Bank of Greencastle, 764 F.2d 950, 954 (3d Cir. 1985); see also In re Mushroom Transp. Co., 382 F.3d 325, 345 (3d Cir. 2004) (explaining that "[a]pparent authority can exist only to the extent that it is reasonable for the third party dealing with the agent to believe the agent is authorized"), and requires a manifestation by the principal "that another has authority to act with legal consequences" on his or her behalf, RESTATEMENT (SECOND) OF AGENCY § 3.03.

In the instant matter, Scott has not proven that Wellington possessed express authority to speak on behalf of Adams. Foremost, there is no evidence that Adams

manifested any intention for Wellington to act as his spokesperson.[14]  See Tribune

Review, 833 A.2d at 119-20 (requiring a manifestation of the principal's intent that

the agent act on his behalf); RESTATEMENT (SECOND) OF AGENCY § 1.03 (stating that

a principal manifests intent through written or spoken words).  Adams and

Wellington never entered any sort of agreement, formal or informal, nor did Adams

ever compensate Wellington for serving as co-moderator of the discussion group.

Furthermore, there is no evidence that Adams instructed Wellington to issue any

statements on his behalf, or that he controlled Wellington's internet-related

activities in any fashion.[15]

Scott has also failed to prove that Wellington enjoyed apparent authority to

speak on Adams' behalf.  Wellington was co-moderator of a discussion group

created by a third party and populated by twenty-five of Adams' fans.  Adams did

not request that the group be created and he did not provide incentives—financial

or otherwise—for its moderators to maintain the group.  Moreover, Adams testified

that he did not sanction or endorse the group or monitor the contents of its

_____

[14] Scott acknowledges that "Adams never made a public announcement that Wellington was his agent," (Doc. 339 at 7), thus conceding, to some degree, that there is no evidence to suggest an express agency.

[15] Rather, there is affirmative evidence to the contrary.  Adams testified that he rarely allowed Wellington to relay the contents of their private conversations, and did not expect her to do so unauthorized.  (See Doc. 304, Att. 5 at 69; Doc. 323 at 70.)  However, on at least one occasion, Wellington disclosed private information via email and acknowledged that she was doing so without Adams' consent.  (See Doc. 326, Ex. L.)  Clearly, Wellington's unauthorized disclosure of information cannot be held against Adams unless he was aware of her action.  Scott presents no such evidence.

discussions. (Doc. 304, Att. 1 ¶ 7.) For the most part, Wellington's testimony supports Adams' portrayal; she stated that she generally did not keep Adams apprised of the group's discussions and that, to her knowledge, he did not monitor those discussions himself. (See Doc. 3, Att. 3 at 23, 28.) In short, there is no evidence that Adams exercised any control over the discussions engaged in by the group and overseen by its moderators, that he was responsible for Wellington's position as moderator within that group, or that Adams manifested an intent for Wellington to speak on his behalf with legal consequence. See RESTATEMENT (SECOND) OF AGENCY § 3.03 (requiring manifestation that purported agent has authority to act with legal consequences on purported principal's behalf); cf. id. cmt b (explaining that a principal may manifest his or her intent "by placing an agent in a defined position in an organization").

Scott attempts to rebut this conclusion by presenting evidence that the discussion group's description trumpeted that it was "an official fan site discussion list sanctioned by Evan Adams." (Doc. 325, Ex. B.) However, Scott proffers nothing to show that Adams was responsible for this description, or that he knew about it and allowed it to remain. See D & G Equip., 764 F.2d at 954 (explaining that apparent authority must "emanate from the actions of the principal and not the agent"). Furthermore, the record indicates that this description was written by Kelso, a non-party to the suit and an individual whose testimony does not appear in the record. If Scott wished to attribute the written description to Adams, it was incumbent upon her to come forth with evidence that Adams requested that Kelso

alter the description, or at the very least knew that she had done so and passively

allowed the description to remain intact.[16]  See <u>Anderson</u>, 477 U.S. at 250-52

(requiring nonmovant to come forward with affirmative evidence beyond his or her

pleadings in support of the claim alleged in order to defeat summary judgment).

Scott also contends that Adams knowingly permitted Wellington to relay

private information to the group, thereby sanctioning Wellington's self-portrayal as

Adams' representative.  Specifically, Scott argues that "it was Wellington's sharing

of what was clearly inside information regarding Adams's activities that initially

established her as his spokesperson."  (Doc. 339 at 6.)  Scott's argument is

unavailing.  It is undisputed that Adams occasionally permitted Wellington to relay

general career information to the group.  (<u>See</u> Doc. 304 ¶ 16; Doc. 317 ¶ 16; <u>but see</u>

Doc. 304, Att. 3 at 14 (indicating that when Wellington requested permission to relay

information, Adams typically declined)).  The record nevertheless contains but a

single instance in which Wellington actually forwarded a message to the discussion

group that she had received from Adams.  (<u>See</u> Doc. 327, Ex. F.)  This message

depicts, *inter alia*, Adams discussing his favorite foods, music, and other actors.

(<u>Id</u>.)  It can hardly be said that by allowing Wellington to forward this email—and

perhaps other emails containing similarly general information, which do not appear

in the record—that Adams manifested an intent for Wellington to speak on his

---

[16] The fact that the description cannot be attributed to Adams also serves to
undermine the affidavit of Nordbo, who testified that she believed Adams endorsed
the group because of the written description.  (<u>See</u> Doc. 320 ¶ 8.)

behalf with legal consequence.  See RESTATEMENT (SECOND) OF AGENCY § 3.03

(requiring "manifestation that another has authority to act with *legal consequences*"

for the principal (emphasis added)).  A purported principal does not vest a

prospective agent with apparent authority merely by permitting the latter to

occasionally relay general career and personal information to a small group via the

internet.  See Volunteer Fire Co., 602 A.2d at 1351 (stating that "[a]gency 'cannot be

assumed from the mere fact that one does an act for another'" (quoting Bross v.

Varner, 48 A.2d 880, 881 (Pa. Super. Ct. 1946))).  The law simply does not impose an

agency relationship so lightly.

After independently examining the summary judgment record, the court

finds insufficient evidence to suggest that Wellington served as Adams' discussion

group spokesperson.  Adams clearly did not control the content of Wellington's

discussion group statements, he did not provide her with remuneration for serving

as co-moderator of the group, and he did not manifest an intention that Wellington

speak on his behalf with legal consequence.  A reasonable person could not

conclude that when Wellington spoke—especially via private email

correspondence[17]—that she did so on Adams' behalf.  Consequently, the court may

not exercise personal jurisdiction on the basis of an agency relationship alone, and

must instead examine Adams' contacts with the forum to determine whether

personal jurisdiction exists.

## B.    **Personal Jurisdiction**

A federal court sitting in diversity may exercise personal jurisdiction over a

nonresident of the forum state only to the extent authorized by the law of the

forum.  FED. R. CIV. P. 4(k)(1)(A).  Pennsylvania law allows for jurisdiction

coextensive with that which is permitted by the Due Process Clause of the

---

[17] The allegedly defamatory statements which are the subject of this suit appear in eleven private emails, each of which was sent by Wellington to Nordbo between February 2, 2001 and December 6, 2001.  (See Doc. 215, Exs. 1, 3, 5-7, 18-19, 25, 38, 39, 41.)  This unique factual foundation presents an extra evidentiary difficulty for Scott, one which she does not seriously attempt to tackle.  Even if Wellington possessed apparent authority to relay general information to the group pertaining to Adams' career, (see Doc. 304 ¶ 16; Doc. 317 ¶ 16), there is no evidence that Adams manifested an intent for Wellington to speak on his behalf via her private email correspondence with individual group members.  Adams was clear in that he did not "expect [Wellington] to share anything with the public" without his approval.  (Doc. 304, Att. 5 at 69; Doc. 323 at 70.)  That Wellington did so against Adams' wishes—and in the context of private conversation—does not render him vicariously liable; under Pennsylvania law, "[a]n agent cannot, simply by his own words, invest himself with apparent authority," Volunteer Fire Co. v. Hilltop Oil Co., 602 A.2d 1348, 1353 (Pa. Super. Ct. 1992).

Scott also claims that in a March 1, 2001 email exchange between Adams and Nordbo, Adams "apparently gave Wellington and Kelso carte blanche as his representatives."  (Doc. 316 at 10.)  An examination of the email belies this assertion.  In this email, which is a response to Nordbo's inquiries regarding messages that Talking Dreams sent to Adams, Adams merely stated, "I have no desire to discuss 'Talking Dreams' with anyone other [than] Pam Wellington and Liz Kelso, whom I know and trust."  (Doc. 215, Ex. 27.)  By so stating, Adams was not bestowing representational authority upon Wellington and Kelso; he was merely exercising caution in responding to Nordbo's query.

Constitution. 42 Pa. Cons. Stat. § 5322(b). Therefore, for personal jurisdiction to be proper, its exercise must comport with federal law.

A federal court entertaining a suit must possess one of two forms of personal jurisdiction over each defendant. The first type, known as specific jurisdiction, requires that the plaintiff's claim arise from the defendant's contacts with the forum in which the court sits. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984); Telcordia Tech Inc. v. Telkom S.A., 458 F.3d 172, 177 (3d Cir. 2006). In contrast, the court may exercise general jurisdiction over a defendant who possesses systematic and continuous contacts with the forum regardless of whether the plaintiff's claim derives from the defendant's in-forum activities. Helicopteros, 466 U.S. at 415 n.9; Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007). The court must determine whether to exercise either form of jurisdiction in light of the "relationship among the defendant, the forum, and the litigation." Helicopteros, 466 U.S. at 414 (1984) (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)). Scott does not contend that Adams maintains systematic and continuous contacts with Pennsylvania, but argues that specific jurisdiction is proper because of Adams' contacts with the state.

Specific jurisdiction allows the court to adjudicate claims levied against defendants with "certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotations omitted). The minimum contacts analysis focuses on whether the defendant has, by some act

related to the plaintiff's current cause of action, "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  Specific jurisdiction generally lies when an individual has intentionally associated with the forum state through judicially cognizable ties, such as the execution of a contract with a resident or the commission of a tortious act in the forum.  See IMO Indus. v. Kiekert AG, 155 F.3d 254, 259-60 (3d Cir. 1998).  However, the "unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."  Burger King, 471 U.S. at 474 (quoting Hanson, 357 U.S. at 253).

When a defendant is charged with committing an intentional tort, the court's jurisdictional inquiry is guided by the "Calder effects test."  See Calder v. Jones, 465 U.S. 783, 788-90 (1984); Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 n.2 (3d Cir. 2004); IMO Indus., 155 F.3d at 261.  The Calder effects test allows a court to "exercise personal jurisdiction over a nonresident defendant who commits an intentional tort by certain acts outside the forum which have a particular type of effect upon the plaintiff within the forum."  IMO Indus., 155 F.3d at 261.  Satisfaction of this test requires that a plaintiff establish that "(1) [t]he defendant committed an intentional tort; (2) [t]he plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of the tort; [and] (3) [t]he defendant expressly aimed his

tortious conduct at the forum such that the forum can be said to be the focal point

of the tortious activity." Marten, 499 F.3d at 297 (quoting IMO Indus., 155 F.3d at

265-66). To satisfy the final element of the test, the plaintiff must (a) demonstrate

that "the defendant knew that the plaintiff would suffer the brunt of the harm

caused by the tortious conduct in the forum," and (b) "point to specific activity

indicating that the defendant expressly aimed its tortious conduct at the forum."

Id. at 298 (quoting Imo Indus., 155 F.3d at 265).

Application of the Calder effects test to the matter *sub judice* leads inexorably

to the conclusion that the exercise of personal jurisdiction over Adams is

inappropriate. Scott has produced no evidence of defamatory emails or messages

sent by Adams to anyone in the Commonwealth of Pennsylvania. Rather, each of

the purportedly defamatory emails in the record was sent by Wellington to Nordbo.

(See Doc. 215, Exs. 1, 3, 5-7, 18-19, 25, 38, 39, 41.) There is also no evidence that

Adams uttered defamatory comments to Wellington, or anyone else, in the forum.

In fact, Scott has produced no evidence that Adams engaged in any tortious

activity, let alone that he intentionally aimed that activity at the forum. What is

more, Scott is a resident of Maryland and she has admitted that the brunt of her

harm was felt in her home state, not in Pennsylvania. (See Doc. 336 at 12.) Thus,

Scott is unable to satisfy any of the <u>Calder</u> effects test prongs and the court is

therefore without specific jurisdiction. Summary judgment is warranted.[18]

---

[18] Even if the court assumes, *arguendo*, that Wellington and Adams consummated an agency relationship, its holding with respect to personal jurisdiction would not change. The mere fact that a principal-agent relationship exists does not confer personal jurisdiction over a nonresident principal. <u>See</u> <u>Nissley v. JLG Indus., Inc.</u>, 452 A.2d 865, 868 (Pa. Super. Ct. 1982) (holding that "it does not necessarily follow [from the fact of an agency relationship] that the jurisdictional contacts made by the agent can be imputed back to the principal"); <u>Myelle v. Am. Cyanamid Co.</u>, No. Civ. A. 92-5243, 1993 WL 93422, at *6 (E.D. Pa. Apr. 1, 1993) (same). Irrespective of an agency relationship, the court must engage in the constitutional inquiry, an exercise which evidences insufficient minimum contacts to hale Adams into this forum. It is true that an agency relationship would allow Scott to attribute Wellington's purportedly defamatory statements to Adams, but these statements appear in only eight different email messages. Minimal in-forum communication of this sort simply does not satisfy the minimum contacts analysis. <u>See</u> <u>IMO Indus. v. Kiekert AG</u>, 155 F.3d 254, 259 n.3 (3d Cir. 1998) (explaining that "minimal communication between the defendant and the plaintiff in the forum state, without more, will not subject the defendant to the jurisdiction of that state's court system"). Furthermore, the existence of an agency relationship would not alter the court's conclusion regarding the focal point of the alleged harm. As noted above, Scott has acknowledged that she experienced the brunt of the harm in the state of Maryland. (<u>See</u> Doc. 336 at 12.) In order to satisfy this prong of the inquiry, Scott must show that Adams knew that she would suffer the brunt of the harm in Pennsylvania. <u>See</u> <u>IMO Indus.</u>, 155 F.3d at 261. Given her concession, Scott cannot satisfy this requirement.

## IV. <u>Conclusion</u>

After extensively reviewing the summary judgment record, the court concludes that it is without personal jurisdiction over Adams. Adams' motion for summary judgment will therefore be granted on all claims which Scott presses against him.

An appropriate order follows.


   <u>S/ Christopher C. Conner</u>
CHRISTOPHER C. CONNER
United States District Judge


Dated:     January 20, 2010

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TERESA ANNE SCOTT, | : | CIVIL ACTION NO. 1:02-CV-1586 |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| PAMELA WELLINGTON LACKEY | : | |
| and EVAN LESLIE ADAMS, | : | |
| | : | |
| Defendants | : | |

## ORDER

AND NOW, this 20th day of January, 2010, upon consideration of defendant

Evan Adams' motion (Doc. 302) for summary judgment and the report and

recommendation (Doc. 336) of the magistrate judge, and for the reasons set forth in

the accompanying memorandum, it is hereby ORDERED that:

1.  The report and recommendation of the magistrate judge (Doc. 336) is REJECTED. <u>See</u> 28 U.S.C. § 636(b).

2.  Adams' motion (Doc. 302) for summary judgment is GRANTED. <u>See</u> Fed. R. Civ. P. 56(c).

3.  The Clerk of Court is directed to defer the entry of judgment on these claims in favor of defendant Evan Adams and against plaintiff Teresa Anne Scott until the resolution of all claims.

_S/ Christopher C. Conner_
CHRISTOPHER C. CONNER
United States District Judge